R. Scott Jerger, WSBA No. 42812
Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
Telephone: (503) 228-9115
Fax: (503) 225-0276
E-mail: scott@fieldjerger.com

Tom Buchele, OSBA No. 081560
(pro hac vice)
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, OR 97219
Telephone: (503) 768-6736
Fax: (503) 768-6642
E-mail: tbuchele@lclark.edu

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| GIFFORD PINCHOT TASK FORCE, a Washington non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, an agency of the United States Government; CALVIN JOYNER, in his official capacity as Acting Regional Forester of the Pacific Northwest; KRISTIE MILLER, in her official capacity as Cowlitz Valley District Ranger; and JANINE CLAYTON, in her official capacity as Forest Supervisor of the Gifford Pinchot National Forest, <br><br> Defendants | Civil No. 3:11-cv-05510-KLS <br><br> MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION <br><br> [ORAL ARGUMENT REQUESTED] |

/ / /

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION – 3:11-cv-05510

Page i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ........................................................................................ 2

III.  OVERVIEW OF THE LAW ...................................................................................... 5

    A.  The Organic Administration Act of 1897 and Forest Service Regulations
        at 36 C.F.R. Parts 251 and 261 ........................................................................... 5

    B.  The National Environmental Policy Act ............................................................ 6

    C.  The Administrative Procedure Act ..................................................................... 8

IV.  STANDARD OF REVIEW ........................................................................................ 8

V.   ARGUMENT .............................................................................................................. 9

    A.  Plaintiff is Likely to Succeed on the Merits ...................................................... 9

        1.  The USFS's approval of Ascot's operation is a final agency action
             subject to review under the APA ............................................................... 9

        2.  Ascot's operation is a "special use" within the meaning of 36 C.F.R.
             § 251.50 and cannot go forward without a special use permit .................. 10

            a.  *Ascot's surface-disturbing activities are among "all uses"
                governed by the special use regulations at 36 C.F.R. § 251.50* ........ 10

            b.  *The USFS acted arbitrarily and capriciously by approving
                Ascot's application without requiring a special use permit* ............... 12

        3.  The USFS's approval of Ascot's drill application is subject to NEPA ................... 14

            a.  *Ascot's drilling operation is subject to federal approval within the
                meaning of NEPA because Ascot must obtain a special use permit* ................... 14

            b.  *Even if it was not a special use, the USFS regulated Ascot's drill
                operation under the U.S. Constitution and the Organic Act of
                1897* ............................................................................................... 16

    B.  Ascot's Drilling is Likely to Cause Irreparable Harm in the Absence of
        Preliminary Relief ............................................................................................. 19

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Page ii

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

**TABLE OF CONTENTS (cont'd)**

C.  The Balance of Hardships Tips in Favor of Preliminary Relief...................................... 22

D.  A Preliminary Injunction is in the Public Interest............................................................ 23

E.  No Bond Should Be Required or the Bond Should Be Nominal ................................. 24

**VI.   CONCLUSION** ............................................................................................................... 24

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Page iii

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

# TABLE OF AUTHORITIES

## UNITED STATES CONSTITUTION

U.S. Const., Art. IV, § 3 cl 2.......................................................................... 18

## STATUTES

5 U.S.C. Appendix 1 ....................................................................................... 2
5 U.S.C. § 551 et seq....................................................................................... 8
5 U.S.C. § 702 ................................................................................................. 8
5 U.S.C. § 704 ............................................................................................ 8, 10
5 U.S.C. § 706(2)(A)....................................................................................... 8
5 U.S.C. § 706(2)(D)....................................................................................... 8
16 U.S.C. § 473 et seq..................................................................................... 5
16 U.S.C. § 551 ......................................................................................... 5, 19
42 U.S.C. §§ 4321–4370f ............................................................................... 1
42 U.S.C. § 4332(c) .............................................................................. 6, 9, 15

## REGULATIONS

36 C.F.R. § 220.4(d) .................................................................................. 7, 14
36 C.F.R. § 220.4(e) ................................................................................ 13, 14
36 C.F.R. § 220.4(e)(1) ................................................................................... 7
36 C.F.R. § 220.4(e)(2) ................................................................................... 7
36 C.F.R. § 220.4(e)(3) ................................................................................... 7
36 C.F.R. § 220.6(c) .................................................................................... 7, 8
36 C.F.R. § 228.1 et seq................................................................................ 11
36 C.F.R. § 251.15 ........................................................................................ 11
36 C.F.R. § 251.50................................................................................. passim
36 C.F.R. § 251.50(a) ........................................................................... passim
36 C.F.R. § 251.50(c) – (e)(3) ........................................................................ 5
36 C.F.R. § 251.50(e)(1) ............................................................................... 13
36 C.F.R. § 251.51......................................................................................... 5
36 C.F.R. § 251.54(b) ................................................................................... 13
36 C.F.R. § 251.54(e) ................................................................................... 13
36 C.F.R. § 251.54(e)(6) ............................................................................... 16
36 C.F.R. § 251.54(g) ................................................................................... 13
36 C.F.R. § 251.54(g)(2)(ii) .................................................................... 13, 16
36 C.F.R. § 251.56(a)(1)(i)(B)................................................................. 15, 16

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Page iv

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

36 C.F.R. § 251.56(a)(1)(ii)(F) ..................................................................... 6
36 C.F.R. § 251.62 ........................................................................................ 14
36 C.F.R. § 261.10 ........................................................................................ 9
36 C.F.R. § 261.10(a) ............................................................................... passim
36 C.F.R. § 261.10(k) ............................................................................... passim
40 C.F.R. § 1501.7 ........................................................................................ 7
40 C.F.R. § 1501.7(a)(1) ............................................................................... 7
40 C.F.R. § 1507.3(b) ................................................................................... 7
40 C.F.R. § 1507.3(b)(2)(ii) .......................................................................... 7
40 C.F.R. § 1508.4 ........................................................................................ 7
40 C.F.R. § 1508.9(a)(1) ............................................................................... 6
40 C.F.R. § 1508.13 ..................................................................................... 7
40 C.F.R. § 1508.18 ..................................................................... 6, 9, 15, 19
40 C.F.R. § 1508.18(a) ................................................................................. 15
40 C.F.R. § 1508.18(b)(4) ....................................................................... 6, 15
40 C.F.R. § 1508.27(b)(5) ............................................................................ 20
40 C.F.R. § 1508.27(b)(10) .......................................................................... 20

**CASE LAW**

Alliance for the Wild Rockies v. Cottrell,
   632 F.3d 1127 (9th Cir. 2011) .......................................... 1, 9, 23

Amoco Prod. Co. v. Vill. of Gambell,
   480 U.S. 531 (1987) ................................................................ 19, 22

Bennett v. Spear,
   520 U.S. 154 (1997) ........................................................................ 10

Blue Mountains Biodiversity Project v. Blackwood,
   161 F.3d 1208 (9th Cir. 1998) ........................................................ 7

Burlison v. U.S. Fish and Wildlife Serv.,
   533 F.3d 419 (6th Cir. 2008) .......................................................... 18

Conservation Congress v. U.S. Forest Serv.,
   2011 WL 1087463 (E.D. Cal. March 4, 2011) ............................... 23

Desert Citizens Against Pollution v. Bisson,
   231 F.3d 1172 (9th Cir. 2000) ........................................................ 23

*/ / /*

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Page v

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

Duncan Energy Co. v. U.S. Forest Serv.,
   50 F.3d 584 (8th Cir. 1995) ...................................................................... 11, 12, 18

Dunn McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,
   964 F.Supp. 1125 (S.D. Tex. 1995) ........................................................... 19

Friends of the Columbia Gorge v. Elicker,
   598 F.Supp.2d 1136 (D.Or. 2007) ............................................................. 16

High Sierra Hikers Assn. v. Blackwell,
   390 F.3d 630 (9th Cir. 2004) .................................................................... 20

Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply,
   295 F.3d 955 (9th Cir. 2002) .................................................................... 15

Kleppe v. New Mexico,
   426 U.S. 529 (1976).................................................................................. 18

Kootenai Tribe of Idaho v. Veneman,
   313 F.3d 1094 (9th Cir. 2002) ................................................................. 23

League of Wilderness Defenders v. Forsgren,
   184 F.Supp.2d 1058, 1070-71 (D.Or. 2002) ........................................... 23

Monsanto v. Geertson Farms,
   --- U.S. ---, 130 S.Ct. 2743 (2010) .......................................................... 19

N. Cascades Conservation Council v. U.S. Forest Serv.,
   98 F.Supp.2d 1193 (W.D. Wa. 1999) ......................................................... 8

Okanogan Highlands v. Williams,
   236 F.3d 468 (9th Cir. 2000) ...................................................................... 8

Oregon Natural Desert Ass'n v. U.S. Forest Serv.,
   465 F.3d 977 (9th Cir. 2006) .................................................................... 10

Oregon State Public Interest Research Group v. Pacfic Coast Seafoods Co.,
   374 F.Supp.2d 902 (D.Or. 2005) ............................................................. 23

People ex rel. Van de Kamp v. Tahoe Regional Plan,
   766 F.2d 1319 (9th Cir. 1985) ................................................................. 24

Ramsey v. Kantor,
   96 F.3d 434 (9th Cir. 1996) ..................................................................... 15

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

Rattlesnake Coalition v. U.S. EPA,
   509 F.3d 1095 (9th Cir. 2007) ........................................................................ 15

Robertson v. Methow Valley Citizens Council,
   490 U.S. 332 (1989)......................................................................................... 6

San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.,
   657 F.Supp.2d 1233 (D. Colo. 2009)........................................................ 19, 22

Save Our Sonoran, Inc. v. Flowers,
   408 F.3d 1113 (9th Cir. 2005) ........................................................................ 23

Sierra Club v. Block,
   614 F.Supp. 488 (D.D.C. 1985) ...................................................................... 24

Sierra Club v. Bosworth,
   510 F.3d 1016 (9th Cir. 2007) ........................................................................ 24

Sierra Club v. U.S. Dept. of Energy,
   255 F.Supp.2d 1177 (D. Colo. 2002)............................................................... 19

U.S. v. Bunskill,
   792 F.2d 938 (9th Cir. 1986) .......................................................................... 18

U.S. v. Lindsey,
   595 F.2d 5 (9th Cir. 1979) .............................................................................. 18

U.S. v. San Francisco,
   310 U.S. 16 (1940)........................................................................................... 18

U.S. v. Volger,
   859 F.2d 638 (9th Cir. 1988) .......................................................................... 18

West Virginia Highlands Conservancy v. Island Creek Coal Co.,
   441 F.2d 232 (4th Cir. 1971) .......................................................................... 24

Wilderness Soc'y v. Tyrell,
   701 F.Supp. 1473 (E.D.Cal. 1988).................................................................. 24

Wilderness Soc'y v. U.S. Forest Serv.,
   630 F.3d 1173 (9th Cir. 2011) ........................................................................ 23

/ / /

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY                    Page vii                    Field Jerger LLP
RESTRAINING ORDER AND                                        621 SW Morrison, Ste. 1225
PRELIMINARY INJUNCTION – 3:11-cv-                                Portland, OR 97205
05510                                                             (503) 228-9115
                                                              (503) 225-0276(fax)

Winter v. Natural Res. Def. Council,
    555 U.S. 7, 129 S.Ct. 365 (2008) ....................................................................................... 8, 19

**OTHER AUTHORITY**

United States Forest Service Manual, Chapter 2830 .................................................................. 12

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION – 3:11-cv-
05510

Page viii

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

## I.  INTRODUCTION

Plaintiff Gifford Pinchot Task Force ("GPTF") seeks a temporary restraining order and preliminary injunction under FRCP 65 to forestall a mining operation that the United States Forest Service ("USFS") approved for the Gifford Pinchot National Forest (the "National Forest") without any public process or analysis. GPTF challenges the USFS's approval for failure to require a special use permit in violation of the Organic Administration Act of 1897 and 36 C.F.R. Part 251, and for failure to perform any public analysis required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f.

To obtain preliminary relief, FRCP 65 requires GPTF to show a probability of success on the merits of its claims, that irreparable harm is likely absent immediate injunctive relief, and that the balance of hardships and the public interest favor such relief. *Alliance for the Wild Rockies v. Cotrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Here, the USFS approved the occupancy and disturbance of a portion of the federally-owned surface of the  National Forest without any of the public notice, opportunity for public comment, or public environmental analysis required by USFS regulations and NEPA. Absent such public comment or analysis the authorized mining activity, ground water use, tree cutting and reopening and use of dirt roads by heavy equipment will likely cause irreparable harm to National Forest resources and the use of the area by GPTF's members. Moreover such harm is imminent because the USFS has authorized the immediate occupancy and disturbance of the National Forest and the USFS has refused to delay its authorization until this Court can decide a fully briefed motion for a preliminary injunction. Under such circumstances the public interest and balance of hardships tips strongly in favor the Court issuing a temporary restraining order.

/ / /

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 1

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

## II.  STATEMENT OF FACTS

The mining operation at issue will be located adjacent to the Mount Saint Helens National Volcanic Monument, within twelve miles of the crater, and near the headwaters of the Green River. The operation is set to take place on a parcel known as Mineral Survey 708 ("MS-708"), a 217-acre piece of land that sits atop a natural copper formation known as the Margaret Deposit. The United States owns the surface of MS-708 and an undivided one-half interest in the underlying mineral estate. Buchele Decl. Ex. 1 at 2. A Canadian developer, Ascot Resources Ltd., owns the other half of the MS-708 mineral estate. Id. at 3.

The United States obtained MS-708 in 1986 from the Trust for Public Lands in order to provide for recreation, to preserve scenic qualities, and to protect the Green River. Buchele Decl. Ex. 2 at 6. That transaction did not involve or create the mineral estate now owned by Ascot. Instead, that estate was first severed by the Duval Corporation in 1984, passed to General Moly Inc. in 2004, and then to Ascot in April 2010. Buchele Decl. Ex. 1 at 2–3.

Shortly after it obtained its mineral estate, in 2010 Ascot applied to the USFS for a "drill permit" to explore the Margaret Deposit beneath MS-708. See Buchele Decl. Ex. 3 at 1. Ascot's permit application followed its predecessor's prior effort in 2007 to obtain a mineral lease from the Bureau of Land Management.[1] The BLM denied that lease after receiving nearly 34,000 comments on an Environmental Assessment prepared under NEPA and after determining that the lease would not be in the public interest. See Buchele Decl. Ex. 1 at 8.[2] The BLM noted,

---

[1] Section 402 of the President's Reorganization Plan No. 3 of 1946 transferred the Department of Agriculture's authority to issue mineral leases on acquired lands to the Department of Interior. See 5 U.S.C. App. 1. However, the Department of Agriculture must still verify that development will not interfere with the primary purposes for which the land was acquired and must impose any conditions necessary to protect those purposes. Id.

[2] The BLM's EA is attached as Buchele Decl. Ex. 2. General Moly also applied for

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
3:11-cv-05510

Page 2

1    however, that General Moly could "apply for authorization from the USFS" for access to its MS-

2    708 mineral estate "subject to an appropriate level of NEPA review." Id. at 6.

3           On August 6, 2010 the USFS issued a "concurrence letter" approving Ascot's application

4    after twice requiring Ascot to include additional mitigation measures to protect the environment.

5    See Buchele Decl. Ex. 4. In that letter the USFS further imposed several conditions of approval,

6    including that Ascot limit the amount of water drawn from seasonal streams and that it wash its

7    vehicles to prevent the spread of noxious weeds. Id. at 2.[3] However, unlike BLM's review of

8    General Moly's 2007 mineral lease application, the USFS did not subject Ascot's drill permit

9    application to public comment or review under NEPA.

10          On January 12, 2011, Ascot submitted another application to expand its 2010 operations.

11   See Buchele Decl. Ex. 6. That application called for 30 new holes at 12 pad locations, the re-

12   opening of 1.6 miles of road, and the use of 2 to 20 gallons of water per minute, which Ascot

13   may or may not need to transport to the site by truck. Id. at 1, 3, 4. The USFS again required

14   Ascot to modify its application, incorporating the previous mitigation measures imposed on its

15   2010 application and adding several others covering the reclamation of water-producing drill

16   casings, seasonal restrictions on drilling to avoid impacts on spotted owl habitat, erosion control,

17   and reclamation standards. See Buchele Decl. at Ex. 7.

18          On February 16, 2011 the GPTF notified the USFS that its consideration of Ascot's 2011

19   drill application was subject to NEPA and that the project would constitute a "special use" under

20   hardrock leases for 682 acres of land surrounding MS-708, which the BLM also denied. Buchele
     Decl. Ex. 1 at 2, 8. On January 20, 2011, Ascot applied to the BLM for an exploration license to

21   expand its drilling operation onto that same land. See Buchele Decl. Ex. 10.

22          [3] The USFS also monitored Ascot's operation after it began, conducted field visits, and
     continued to impose conditions to mitigate the environmental impacts associated with Ascot's

23   project. See Buchele Decl. Ex. 5.

MEMORANDUM IN SUPPORT OF              Page 3                    Field Jerger LLP
MOTION FOR TEMPORARY                                           621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                          Portland, OR 97205
PRELIMINARY INJUNCTION                                         (503) 228-9115
3:11-cv-05510                                                  (503) 225-0276(fax)

1   the USFS's own regulations. See Buchele Decl. Ex. 8. The GPTF stated that it had the right to

2   comment on the proposal under NEPA. Id. at 3–4.

3           On May 5, 2011, nearly three months after the GPTF notified the USFS that its approval

4   would be subject to NEPA, and nearly four months after Ascot submitted its 2011 application,

5   the USFS approved Ascot's 2011 drill application through another informal "concurrence letter."

6   See Buchele Decl. Ex. 9 at 3. Recognizing that Ascot's operation may negatively affect the

7   surrounding environment, that letter imposed additional mitigation measures. Id. However, like

8   its approval of Ascot's 2010 drill application, the USFS did not prepare any public NEPA

9   analysis prior to approving Ascot's most recent application. It did not give public notice

10  consistent with NEPA and its implementing regulations. And the USFS provided no opportunity

11  to comment on the project's impacts. The GPTF did not receive actual notice of the May 5th

12  concurrence letter until June 8, 2011. The USFS cover letter accompanying the concurrence

13  letter also asserted that the USFS had done a "NEPA review." See Buchele Decl. Ex. 9 at 1.The

14  GPTF immediately served the USFS with a FOIA request on June 10th seeking any

15  documentation of that non-public "NEPA review." Buchele Decl. Ex. 19. However, while

16  waiting for the response to that FOIA request, GPTF learned in late June that although the

17  access road was still snow covered the authorized drilling operations could begin at any moment.

18  Walz Decl. at ¶ 14. GPTF then immediately filled its complaint and its motion for preliminary

19  relief, on July 5 and 7th respectively, to protect its rights and the status quo pending the Court's

20  final ruling on the merits of GPTF's claims

21  / / /

22  / / /

23  / / /

MEMORANDUM IN SUPPORT OF           Page 4           Field Jerger LLP
MOTION FOR TEMPORARY                                 621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                Portland, OR 97205
PRELIMINARY INJUNCTION                               (503) 228-9115
3:11-cv-05510                                        (503) 225-0276(fax)

1

### III.  OVERVIEW OF THE LAW

2

**A.      The Organic Administration Act of 1897 and Forest Service Regulations at 36 C.F.R. Parts 251 and 261.**

3

4   Through the Organic Administration Act of 1897, 16 U.S.C. § 473 et seq., Congress

5   charged the Secretary of Agriculture with administration of the National Forests. The Organic

6   Act directs the Secretary to "make provisions for the protection against destruction by fire and

7   depredations upon the public forests and national forests which may have been set aside or which

8   may be hereafter set aside." 16 U.S.C. § 551. The Act also directs the Secretary to establish rules

9   governing the occupancy of national forests and to prevent their destruction. Id.

10   Pursuant to the Organic Act, the Secretary adopted the regulations at 36 C.F.R. Parts 251

11   and 261. Those regulations provide that "all uses" of National Forest System lands are

12   designated "special uses" unless specifically exempted by regulation of the Secretary. 36 C.F.R.

13   § 251.50(a). Except in narrow circumstances provided at 36 C.F.R. § 251.50(c)–(e)(3), an

14   individual or entity must apply for and obtain a "special use authorization" from the USFS

15   before engaging in any special use on National Forest System lands. Id.

16   A special use authorization is "a permit, term permit, lease, or easement which allows

17   occupancy, use, rights, or privileges of National Forest System land." Id. at § 251.51. Among

18   other things, a special use permit must contain terms and conditions that will "[m]inimize

19   damage to scenic and aesthetic values and fish and wildlife habitat and otherwise protect the

20   environment." Id. at § 251.56(a)(1)(i)(B). Special use permits must also contain "[s]uch terms

21   and conditions as the authorized officer deems necessary to. . . require siting to cause the least

22   damage to the environment, taking into consideration feasibility and other relevant factors." Id.

23   at § 251.56(a)(1)(ii)(F). Before issuing a permit, the USFS must give public notice of the

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 5

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1   application pursuant to its NEPA regulations. Id. § 251.54(g)(2)(ii). It must also invite the public

2   to comment. Id. Absent a permit, special uses are prohibited in national forests, including the

3   construction or maintenance of any road or other improvement. Id. § 261.10(a), (k).

4   **B.     The National Environmental Policy Act.**

5          NEPA requires every federal agency contemplating "major federal action significantly

6   affecting the quality of the human environment" to prepare and circulate a detailed statement of

7   environmental consequences. 42 U.S.C. § 4332(c). That statement, known as an Environmental

8   Impact Statement ("EIS"), plays two important "action-forcing" roles. First, it ensures that

9   agencies will take a "hard look" at environmental consequences before they decide to act.

10  Second, it ensures "broad dissemination of relevant environmental information." Robertson v.

11  Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). The Council on Environmental

12  Quality ("CEQ") has adopted regulations implementing NEPA that are binding on all federal

13  agencies. Under those regulations, an EIS must be prepared for all actions "with effects that may

14  be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. §

15  1508.18. This includes, for example, "actions approved by permit or other regulatory decision as

16  well as federal and federally assisted activities." Id. at (b)(4).

17         To determine whether or not an action "may" have significant effects, CEQ's regulations

18  allow federal agencies to first prepare a shorter Environmental Assessment ("EA"), the purpose

19  of which is to "provide sufficient evidence and analysis for determining whether to prepare and

20  environmental impact statement." 40 C.F.R. § 1508.9(a)(1). If "substantial questions" remain

21  after preparation of an EA, then the agency must prepare an EIS. Blue Mountains Biodiversity

22  Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998). On the other hand, if an EA shows

23  that the project will not have significant environmental impacts, then the agency may issue a

MEMORANDUM IN SUPPORT OF           Page 6           Field Jerger LLP
MOTION FOR TEMPORARY                               621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                 Portland, OR 97205
PRELIMINARY INJUNCTION                                  (503) 228-9115
3:11-cv-05510                                        (503) 225-0276(fax)

1    Finding of No Significant Impact ("FONSI") without preparing an EIS. 40 C.F.R. § 1508.13.

2          CEQ's regulations charge every federal agency with establishing procedures to identify

3    whether an EIS or an EA is required. 40 C.F.R. § 1507.3(b). Those regulations also permit

4    agencies to adopt Categorical Exclusions ("CE") through notice and comment rulemaking. 40

5    C.F.R. § 1507.3(b)(2)(ii). A CE is "a category of actions which do not individually or

6    cumulatively have a significant effect on the human environment," and therefore normally do not

7    require the preparation of either an EIS or an EA. Id; see also 40 C.F.R. § 1508.4.

8          Importantly, all federal actions, whether they normally require an EIS or an EA, or

9    appear to fall within a CE, must be subject to prior public notice through a process known as

10   "scoping." Scoping is an "open process for determining the scope of issues to be addressed and

11   for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. During

12   scoping, CEQ directs each agency to "invite the participation of . . . interested persons (including

13   those who might not be in accord with the action on environmental grounds)." Id. at (a)(1). The

14   USFS's own NEPA regulations make clear that "all Forest Service Proposed actions, including

15   those that would appear to be categorically excluded from further analysis and documentation in

16   an EA or an EIS" are subject to public scoping as defined by CEQ. See 36 C.F.R. § 220.4(e)(1),

17   (2). Under its own regulations, the USFS must invite the public to participate in the scoping

18   process by publishing descriptions of proposed actions in its Schedule of Proposed Actions

19   (SOPA). Id. at (d), (e)(3). And the USFS must then decide whether to prepare and EA or an EIS

20   based on information obtained during the scoping process. Id. at § 220.6(c). For example, if after

21   scoping "it is uncertain whether the proposed action may have a significant effect on the

22   environment," the USFS must prepare an EA. Id.

23   / / /

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 7

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1  **C.      The Administrative Procedure Act.**

2          The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., provides a private

3  cause of action for any person "suffering legal wrong because of agency action, or adversely

4  affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

5  Actions reviewable include "[a]gency action made reviewable by statute and final agency action

6  for which there is no other adequate remedy." Id. at §704. Here, neither NEPA nor the Organic

7  Act provide a private cause of action for judicial review of agency non-compliance. As such, the

8  APA governs judicial review under those statutes and review is limited to final actions. See Id.;

9  Okanogan Highlands v. Williams, 236 F.3d 468 (9th Cir. 2000) (reviewing claims alleging

10  violations of both NEPA and the Organic Act under the APA). Under the APA, a court may hold

11  unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or

12  undertaken without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

13                              **IV.  STANDARD OF REVIEW**

14          To obtain a temporary restraining order or preliminary injunction under FRP 65, a

15  plaintiff must demonstrate: 1) it is likely to suffer irreparable harm in the absence of preliminary

16  relief; 2) a probability of success on the merits; 3) that the balance of hardships tips in favor of

17  preliminary relief; and 4) that an injunction is in the public interest. Winter v. Natural Res. Def.

18  Council., 555 U.S. 7, ---, 129 S.Ct. 365, 374 (2008); N. Cascades Conservation Council v. U.S.

19  Forest Serv., 98 F.Supp.2d 1193, 1196 (W.D. Wa. 1999). In the Ninth Circuit, courts judge the

20  probability of success and the balance of hardships on a sliding scale. Alliance for the Wild

21  Rockies, 632 F.3d at 1135. For example, a plaintiff need not demonstrate that it is more likely

22  than not to succeed if there are "serious questions going to the merits" and the balance of

23  hardships tips sharply in favor of preliminary relief. Id.

MEMORANDUM IN SUPPORT OF          Page 8              Field Jerger LLP
MOTION FOR TEMPORARY                                 621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                    Portland, OR 97205
PRELIMINARY INJUNCTION                                      (503) 228-9115
3:11-cv-05510                                            (503) 225-0276(fax)

## V. ARGUMENT

**A.      Plaintiff is Likely to Succeed on the Merits.**

Plaintiff GPTF states two claims for relief. First, Plaintiff alleges that the USFS violated the Organic Administration Act of 1897 and 36 C.F.R. Part 251 by approving Ascot's January 12, 2011 application without issuing a special use permit or subjecting Ascot's application to public notice and comment. See Compl. at ¶¶ 48–53. Second, Plaintiff alleges that USFS violated NEPA by approving Ascot's application without issuing an EIS, an EA, or engaging in the scoping process necessary to apply a Categorical Exclusion. Id. at ¶¶ 54–59.

To succeed on the merits of these claims, Plaintiff must first show prove that the USFS's May 5, 2011 "concurrence letter," where the USFS approved Ascot's most recent drilling application, is a "final agency action" within the meaning of the APA, 5 U.S.C. § 704. Second, to succeed on its first claim for relief, Plainitff  must show that the surface-disturbing activities associated with Ascot's drilling operation are "special uses" within the meaning 36 C.F.R. § 251.50. Plaintiff must also show that the USFS approved Ascot's application without issuing a special use permit in violation of 36 C.F.R. § 261.10. Third, to succeed on its second claim for relief, Plaintiff must show that the USFS's approval letter is likely "major federal action" triggering review under NEPA, 42 U.S.C. § 4332(C). Specifically, Plaintiff must show that Ascot's operation is "potentially subject to Federal control and responsibility." 40 C.F.R. §1508.18. As discussed below, the GPTF is likely to succeed on all counts.

### 1.      The USFS's approval of Ascot's operation is a final agency action subject to review under the APA.

Plaintiff GPTF is likely to succeed in showing that the USFS's May 5, 2011 letter of concurrence is a "final agency action" within the meaning of Section 704 of the APA, 5 U.S.C. §

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION 3:11-cv-05510

Page 9

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

704. An agency action is final within the meaning of Section 704 when that action: 1) marks "the consummation of the agency's decision-making process;" and 2) is a decision "by which rights or obligations have been determined or from which legal consequences flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997); Oregon Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006). The USFS's concurrence letter easily meets this two-prong test.

Through its concurrence letter, the USFS approved Ascot's most recent application for exploratory drilling, thus marking the consummation of the USFS's decision-making process. Further, that letter gives Ascot the immediate right to begin drilling, thus determining Ascot's legal rights with respect to its mineral estate. For these reasons, Plaintiff is likely to succeed in showing that the USFS's concurrence letter is a final agency action under the APA.

**2.      Ascot's operation is a "special use" within the meaning of 36 C.F.R. § 251.50 and cannot go forward without a special use permit (Claim One).**

*a.      Ascot's surface-disturbing activities are among "all uses" governed by the special use regulations at 36 C.F.R. § 251.50.*

As discussed above, the Organic Administration Act of 1897 directs the Secretary to establish rules and regulations governing the occupancy and use of the national forests and to prevent their destruction. Pursuant to that authority, the Secretary promulgated 36 C.F.R. Part 251 to govern the USFS's approval of "special uses" within the National Forests. Special uses include "all uses of National Forest System lands, improvements, and resources" except specifically enumerated uses. 36 C.F.R. § 251.50(a).[4] Special uses generally include the construction or maintenance of any road, structure, or other improvement on National Forest System land. Id. at § 261.10(a). And special uses are prohibited in the national forests except

---

[4] Uses specifically exempted from the USFS's special use regulations are those associated with use of roads, grazing and livestock, the sale and disposal of timber and other organic forest products, and mineral development pursuant to 36 C.F.R. Part 228. See 36 C.F.R. § 251.50(a).

1    when authorized by the USFS through a special use permit Id. at § 261.10(k).

2         With respect to private mineral development in national forests, ownership of the

3    underlying mineral estate determines whether that development is a special use requiring a

4    special use permit.[5] Private ground-disturbing activities associated with <u>outstanding</u> mineral

5    rights, where outstanding mineral rights are those conveyed to a third party before the United

6    States takes title to the surface estate, such as Ascot's mineral right, are "special uses" under 36

7    C.F.R. § 251.50. <u>Duncan Energy Co. v. U.S. Forest Serv.</u>, 50 F.3d 584, 589 (8th Cir. 1995).

8         In <u>Duncan</u>, the Eighth Circuit explained that the Secretary's special-use regulations at 36

9    C.F.R. § 251.50 apply to ground-disturbing activities associated with outstanding mineral rights.

10   There, the appellant argued that the Secretary's special-use regulations did not apply because,

11   <u>inter alia</u>, it would be "illogical" for the USFS to regulate <u>outstanding</u> mineral rights under 36

12   C.F.R. § 251.50, but regulate activities associated with <u>reserved</u> mineral rights under the separate

13   provisions at 36 C.F.R. § 251.15. <u>Duncan</u>, 50 F.3d at 589.

14        The Eighth Circuit rejected that argument. Instead, looking to the plain language of the

15   Secretary's special use regulations, <u>Duncan</u> explained that ground-disturbing activities associated

16   with outstanding mineral rights are among "all uses" covered by 36 C.F.R. § 251.50. <u>Id</u>. The

17   Eighth Circuit further noted that the USFS Manual itself explains that "the exercise of all

18   reserved and outstanding mineral rights is subject to applicable Federal and State laws and

19   regulations pertaining to mining, real property, and environmental protection," making it even

20

[5] For example, private mineral prospecting and associated ground-disturbing activities on land
21   wholly owned by the United States are specifically governed by 36 C.F.R. § 228.1 et seq. and do
     not constitute special uses. 36 C.F.R. § 251.50(a). Private ground-disturbing activities associated
22   with <u>reserved</u> mineral rights, where reserved mineral rights are those reserved to the grantor in
     conveyance to the United States, require a "permit" and are subject to the Secretary's regulations
23   at 36 C.F.R. § 251.15.

MEMORANDUM IN SUPPORT OF            Page 11            Field Jerger LLP
MOTION FOR TEMPORARY                                  621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                 Portland, OR 97205
PRELIMINARY INJUNCTION                                (503) 228-9115
3:11-cv-05510                                         (503) 225-0276(fax)

1    clearer that activities associated with outstanding mineral rights fall within the ambit of 36

2    C.F.R. § 251.50. Id. at 590 (quoting USFS Manual at 2830.1).[6]

3         Here, Ascot's mineral rights are outstanding mineral rights, severed from MS-708 before

4    the United States took title. The United States obtained its surface estate and one-half mineral

5    rights from the Trust for Public Lands, who reserved no interest when it conveyed that land. See

6    Buchele Decl. Ex. 2 at 11–12. As such, the surface-disturbing activities and improvements

7    described in Ascot's drill application (e.g. road construction and maintenance, structures, etc.)

8    are among "all uses" governed by the Secretary's special use regulations.

9                   **b.    The USFS acted arbitrarily and capriciously by approving Ascot's
                            application without requiring a special use permit.**

10        Despite that the USFS's own regulations expressly require a special use permit, and

11   despite that Ascot's surface activities are otherwise prohibited, the USFS approved Ascot's plan

12   without issuing, or even requiring Ascot to apply for, a special use permit. In so doing, the USFS

13   acted arbitrarily, capriciously, and without observance of procedures required by law.

14        Under 36 C.F.R. § 251.50(a), "[b]efore conducting a special use, individuals or entities

15   must submit a proposal to the authorized officer and must obtain a special use authorization from

16   the authorized officer," unless that requirement is waived by paragraphs (c) through (e)(3) of that

17   regulation.[7] Outside those exemptions, which do not apply here, 36 C.F.R. Part 261 prohibits all

18   special uses not authorized by a special use permit. See e.g. 36 C.F.R. § 261.10(a), (k).

19        Here, no provision within 36 C.F.R. § 251.50 exempts Ascot from the requirement to

20   _____

21   [6] Chapter 2830 of the Forest Service Manual is attached as Buchele Decl. Ex. 11.

22   [7] Those paragraphs go on to exempt, among other activities not relevant here, noncommercial
     recreational activities, travel on National Forest System roads, and uses so nominal that "it is not
23   necessary to establish terms and conditions in a special use authorization to protect National
     Forest System lands and resources." 36 C.F.R. § 251.50(e)(1).

MEMORANDUM IN SUPPORT OF          Page 12                  Field Jerger LLP
MOTION FOR TEMPORARY                                       621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                      Portland, OR 97205
PRELIMINARY INJUNCTION                                     (503) 228-9115
3:11-cv-05510                                              (503) 225-0276(fax)

1    obtain a special use permit. And through its multiple conditions of approval (e.g. for erosion and

2    weed control), the USFS essentially admits that terms and conditions are required to protect

3    National Forest System lands and resources. See e.g. Buchele Decl. Exs. 7 & 9. Yet, the USFS

4    did not even require Ascot to apply for a special use permit or inform the public of Ascot's drill

5    operation by publishing a description in that project in its Schedule of Proposed Actions as

6    required by the USFS's special use regulations.

7           For example, an applicant must first submit a "proposal," either orally or in writing, to

8    obtain a special use permit. 36 C.F.R. § 251.54(b). The USFS must then subject that proposal to

9    two pre-application screening procedures to determine, inter alia, if the proposed use is in the

10   public interest. See id. at § 251.54(e). If the proposal passes both those screening procedures, the

11   USFS must notify the Applicant that it may submit a formal written application for a special use

12   permit. Id. at § 251.54(g). The USFS must then give public notice and allow the public to

13   comment on the application "in accordance with Forest Service NEPA procedures." Id. at §

14   251.54(g)(2)(ii). Among other things, the USFS's NEPA procedures require it to engage in the

15   public scoping process for all actions, even those that appear to fall within a CE. See 36 C.F.R. §

16   220.4(e). In effect, this means that all special use applications, and in fact all other "Forest

17   Service proposed actions," must be subjected to public comment under NEPA. Id. At a

18   minimum, the USFS must begin the scoping process by publishing a description of all proposed

19   actions in its Schedule of Proposed Actions (SOPA). 36 U.S.C. § 220.4(d), (e).[8] Last, even after

20   scoping, and the USFS has agreed to issue the permit, the permit does not take effect until signed

21   and returned by the applicant, who must agree to all mitigation measures and conditions of

22   _____

23   [8] The USFS's Schedule of Proposed Action, complete from January 1, 2010 through June 30,
     2011, is attached as Buchele Decl. Ex. 17.

MEMORANDUM IN SUPPORT OF              Page 13                    Field Jerger LLP
MOTION FOR TEMPORARY                                            621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                           Portland, OR 97205
PRELIMINARY INJUNCTION                                          (503) 228-9115
3:11-cv-05510                                                   (503) 225-0276(fax)

1    approval. 36 C.F.R. § 251.62. Otherwise, the use is prohibited. 36 C.F.R. § 261.10(a), (k).

2           Here, the USFS did not follow any of these procedures, choosing instead to approve

3    Ascot's operation through an informal "concurrence letter" not subject to any public notice or

4    comment. Moreover, the USFS's concurrence letter purports to give Ascot the immediate right to

5    drill without requiring Ascot to formally accept the conditions imposed by the USFS's approval.

6           Plaintiff is thus likely to succeed on its claim that the USFS violated its own regulations

7    by approving Ascot's drill operation other than through a special use permit.

8           **3.     The USFS's approval of Ascot's drill application is subject to NEPA.**

9           In addition to its first claim, Plaintiff is likely to succeed on its Second Claim for Relief

10   that the USFS acted arbitrarily and capriciously by not reviewing Ascot's drill application under

11   NEPA. The USFS evaluated, regulated, and approved Ascot's drill application. Ascot's drilling

12   is thus subject to federal approval within the meaning of NEPA and the USFS has a duty to

13   publicly evaluate Ascot's drill operation through the public scoping procedures attendant to a

14   CE, by preparing an EA, or by preparing an EIS. Because the USFS has not taken any of those

15   actions, Plaintiff is likely to show that the USFS acted arbitrarily, capriciously, and without

16   observance of procedure required by law within the meaning of the APA.

17          *a.     Ascot's drilling operation is subject to federal approval within the*
             *meaning of NEPA because Ascot must obtain a special use permit.*
18
            As discussed above, NEPA requires every federal agency to include a detailed statement
19
     of environmental impacts within every proposal for "major Federal action significantly affecting
20
     the quality of the human environment." 42 U.S.C. § 4332(c). Under CEQ's regulations
21
     implementing NEPA, "major federal action" is defined in part to include actions "which are
22
     potentially subject to Federal control and responsibility." 40 C.F.R. §1508.18. As such, major
23

MEMORANDUM IN SUPPORT OF              Page 14              Field Jerger LLP
MOTION FOR TEMPORARY                                      621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                     Portland, OR 97205
PRELIMINARY INJUNCTION                                    (503) 228-9115
3:11-cv-05510                                             (503) 225-0276(fax)

federal actions specifically include federal approval of otherwise non-federal actions, including

actions by private parties on private property. Examples include "new and continuing activities,

including projects and programs entirely or partly financed, assisted, conducted, regulated, or

approved by federal agencies." Id. at § 1508.18(a); see also id. at § 1508.18(b)(4) (defining

major federal action to include projects "approved by permit or other regulatory decision.").

The Ninth Circuit has explained that an action is "subject to federal approval" within the

meaning of 40 C.F.R. § 1508.8 when federal decisionmakers have "'power, authority, or

control'" over otherwise non-federal action. Rattlesnake Coalition v. U.S. E.P.A., 509 F.3d 1095,

1101 (9th Cir. 2007) (quoting Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply, 295

F.3d 955, 960 (9th Cir. 2002)). For example, the Ninth Circuit has explain that "[i]t is clear . . .

that if a federal permit is a prerequisite for a project with adverse impact on the environment,

issuance of that permit does constitute major federal action and the federal agency involved must

conduct an EA and possibly an EIS before granting it." Ramsey v. Kantor, 96 F.3d 434, 444 (9th

Cir. 1996).

As a special use requiring a permit under 36 C.F.R. § 251.50, Ascot's drilling falls within

the CEQ's definition of actions over which the USFS has power, control, or authority to give

more than non-binding advice. For example, 36 C.F.R. § 261.10(a) and (k) specifically prohibit

private individuals from engaging in special uses without a special use permit. Activities

prohibited include, for example, constructing or maintaining any road or other improvement.

These activities are essential to Ascot's drill operation. Obtaining a special use permit is thus a

prerequisite to Ascot's operation and the USFS's approval is subject to NEPA.

As well, the USFS's own regulations vest it with significant authority to set the terms of

special use permits and to condition its approval on adequate mitigation measures. See 36 C.F.R.

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 15

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

§ 251.56(a)(1)(i)(B) (special use authorization "must contain" terms that will "[m]inimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment."). By prohibiting these activities, and retaining the authority to condition its approval on adequate mitigation measures, the USFS possesses significant power, authority, and control over special uses on National Forest System lands. See e.g. Friends of the Columbia Gorge v. Elicker, 598 F.Supp.2d 1136, 1153 (D.Or. 2007) (project held subject to NEPA because, inter alia, it required a USFS special use permit).

Last, the USFS's own regulations contemplate that special-use applications are subject to NEPA. See 36 C.F.R. § 251.54(g)(2)(ii) (The public "shall receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application in accordance with Forest Service NEPA procedures."). Those regulations even define the point in the application process at which NEPA applies. See 36 C.F.R. § 251.54(e)(6) (A proposal that fails the pre-application screening process "does not constitute an agency proposal as defined [by the CEQ] and, therefore, does not require environmental analysis and documentation.").[9]

### b.     Even if it was not a special use, the USFS regulated Ascot's drill operation under the U.S. Constitution and the Organic Act of 1897.

Even assuming, arguendo, that Ascot's drill application is not a special use under the USFS's own regulations, the USFS has in fact evaluated, regulated, and subjected Ascot's drill

_____

[9] Consistent with these USFS regulations, a 2007 Memo from the USDA Office of General Counsel explains "Forest Service action in the development of reserved or outstanding mineral rights is subject to NEPA because the agency has authority to regulate surface occupancy." Buchele Decl. Ex. 12 at 3. That memo explains that because mining of outstanding mineral rights requires a special use permit and involves agency discretion, NEPA applies. Id. at 4 n. 6. The USFS is currently pursuing this position before the Third Circuit in its opening brief for the case Minard Run Oil Co. v. U.S. Forest Serv., No. 10-1265 & 10-2332 (3rd Cir.). See Buchele Decl. Ex. 14. Throughout its brief, the government vigorously argues that "the Forest Service has significant legal authority to place reasonable conditions on the use of the surface to protect the federal surface resources." Id. at 50.

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 16

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1   operation to federal approval within the meaning of NEPA. And it has the authority to do so not

2   only under the USFS's special use regulations, but under the United State's Constitution and the

3   Organic Administration Act of 1897 as well.

4        For example, in 2010 the USFS granted Ascot "permission" to use the forest roads

5   leading to MS-708, but cautioned that Ascot would ultimately have to obtain, and pay for, a

6   Road Use Permit. Buchele Decl. Ex. 4 at 2. The USFS imposed conditions on when Ascot could

7   access MS-708 (it would need to get further permission to drill during the winter). Id. at 3. The

8   USFS imposed conditions on where Ascot could drill from (Ascot "will not occupy" any part of

9   the Tumwater Roadless Area, and must use directional drilling to avoid that area). Id. at 2–3. The

10  location of water storage would have to be mutually agreed upon by Ascot and the USFS. Id. at

11  2. And Ascot's trucks would need to be washed and inspected by USFS personnel to prevent the

12  spread of noxious weeds. Id. at 3.

13       In 2011, the USFS again imposed conditions of approval on Ascot's most recent drill

14  application. Those included proper reclamation of water-producing bore holes; a prohibition on

15  snow plowing; erosion control measures requiring USFS supervision; a prohibition on cutting

16  trees more than 8 inches in diameter without prior USFS approval; and seasonal restrictions to

17  avoid negative impacts on "unsurveyed, potential owl habitat." Buchele Decl. Ex. 7 at 1 – 3; see

18  also Ex. 9 at 1–2 (approval letter imposing additional erosion and weed control measures).

19       These conditions of approval are authorized by, and consistent with, the Property Clause

20  of the United States Constitution and the Organic Act. For example, the Property Clause

21  provides that "Congress shall have Power to dispose of and make all needful Rules and

22  Regulations respecting the Territory or other Property belonging to the United States; and

23  nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States,

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 17

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

or of any particular State." U.S. Const. Art. IV, § 3 cl 2. And the Supreme Court has repeatedly

explained that "[t]he power over the public land thus entrusted to Congress is without

limitations." Kleppe v. New Mexico, 426 U.S. 529, 539 (1976) (quoting U.S. v. San Francisco,

310 U.S. 16, 29 (1940) and collecting authorities).

Under the Property Clause, the United States may regulate conduct not only on federal

land, but also on adjacent private land so long as such regulation is "needful" and "respecting"

the public lands. Kleppe,426 U.S. at 536 (1976); U.S. v. Lindsey, 595 F.2d 5, 6 (9th Cir. 1979);

U.S. v. Vogler, 859 F.2d 638 (9th Cir. 1988). For example, the Ninth Circuit has held that miners

may be ejected from national forest land if they lack an approved plan of operation. U.S. v.

Brunskill, 792 F.2d 938 (9th Cir. 1986). The Sixth Circuit has held that the power conferred by

the Property Clause is "sufficiently broad to authorize Congressional regulation of private-

property interests that are located on public lands." Burlison v. U.S. Fish and Wildlife Serv., 533

F.3d 419, 432-33 (6th Cir. 2008). And at least three courts have held that federal regulation of

sub-surface mineral rights is consistent with the Property Clause. See Duncan, 50 F.3d at 588;

Dunn McCampbell Royalty Interest, Inc. v. Nat'l Park Serv., 964 F.Supp. 1125, 1138 (S.D. Tex.

1995), aff'd on other grounds at 112 F.3d 1283 (5th Cir. 1997); Sierra Club v. U.S. Dep't of

Energy, 255 F.Supp.2d 1177, 1185-86 (D. Colo. 2002); cf San Luis Valley Ecosystem Council v.

U.S. Fish and Wildlife Serv., 657 F.Supp.2d 1233, 1244 (D.Colo. 2009) (exploratory drilling on

split estate likely subject to NEPA).

Here, Congress delegated its authority to manage national forest lands to the Secretary of

Agriculture when it passed the Organic Act, charging the Secretary to regulate the occupancy

and use of federal land and to prevent its destruction. 16 U.S.C. § 551. As delegates of that

authority, the USFS and other defendants in this case exercised their discretion and regulated the

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 18

surface use of MS-708 in 2010 and 2011. As such, Ascot's operation is an action "potentially subject to Federal control and responsibility" within the meaning of NEPA. 40 C.F.R. § 1508.18. And Plaintiff is likely to succeed on its Second Claim for Relief that the USFS acted arbitrarily and capriciously by failing to subject Ascot's application to any form of public NEPA review.

**B.     Ascot's Drilling Operation is Likely to Cause Irreparable Harm in the Absence of Preliminary Relief.**

The Supreme Court has explained that injury to the environment is often irreparable because "by its nature, [it] can seldom be adequately remedied by money damages and is often permanent or at least of long duration." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987). The Court has also recently explained that "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." Winter, 129 S.Ct. at 376. For this reason, the NEPA process is especially crucial when an agency is considering an activity with unknown or uncertain effects on the environment. Monsanto v. Geertson Farms, --- U.S. ---, 130 S.Ct. 2743, 2768 (2010) (Stevens, J. dissenting); see also 40 C.F.R. § 1508.27(b)(5) (EIS may be required where impacts "are highly uncertain or involve unique or unknown risks."). Reflecting the importance of NEPA review, the Ninth Circuit has explained "in the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." High Sierra Hikers Assn. v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004).

Here, USFS staff charged with reviewing Ascot's drill application have admitted that they know little about mineral development in the Gifford Pinchot National Forest. See Buchele Decl. Ex. 15 at 1 ("It has been many years since [there has been] any drilling projects on this forest, so many of us are unfamiliar with the equipment, techniques, operational requirements

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 19

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1    and impacts from this activity."). Further, the GPTF has attached the declaration of Joseph D.

2    Leyda, a professional wetland scientist and certified ecologist, detailing a number of

3    environmental harms associated with Ascot's drill operation. These include impacts to

4    groundwater, surface water, wetlands, and sensitive plant and animal species.

5          For example, Ascot's drill operation is expected to use up to .87 million gallons of

6    groundwater per month for up to six months. Leyda Decl. at ¶ 6. Not only has Ascot apparently

7    not consulted with the Washington Department of Ecology to ensure compliance with

8    Washington law,[10] such a large diversion of groundwater will likely have negative impacts on

9    water levels within the Green River and its tributaries. Id. at ¶ 9. It also appears likely that the

10   groundwater beneath MS-708 is under pressure, increasing the risk of an uncontrolled upwelling

11   and diversion from surface waters if bore holes are inappropriately sealed and abandoned. Id. at ¶

12   7, 10. Reduction of surface water in the Green River or its tributaries, either through usage or

13   waste of groundwater, may negatively impact Bull Trout habitat, a species listed under the

14   Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1599. Id. at ¶ 15. Reduced flow to the Green

15   River may also impact steelhead spawning grounds, another species listed under the ESA. Lynch

16   Decl. at ¶ 8. As explained in the declaration of Mr. Leyda, "[a] careful hydrogeologic analysis

17   should be completed in order to address these possible serious impacts." Leyda Decl. at ¶ 10.

18         Reduction of groundwater flow may also negatively impact forested wetland seeps and

19   seasonally-inundated wetland pools. Id. at ¶ 16. To date, no delineation of wetlands or waters has

20   been completed in the area surrounding Ascot's drill operation. Id. And reduction of

21   groundwater flow to wetlands and other surface waters may reduce the habitat of three special-

22         [10] For example, it does not appear that Ascot has applied for a groundwater permit as
     required by RCW Chapter 90.44. Leyda Decl. at ¶ 8. Under NEPA, compliance with state law is
23   one factor affecting whether an EIS should be prepared. See 40 C.F.R. § 1508.27(b)(10).

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 20

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1  status salamanders: Larch Mountain salamander (state sensitive species); Van Dyke's

2  salamander (state and federal species of concern); and Cascade torrent salamander (state species

3  of concern). Id. at ¶ 11, 17.

4        In addition to impacts from reduced groundwater flow, surface disturbance associated

5  with Ascot's drill operation, such as the construction and maintenance of roads, could negatively

6  impact several species listed as threatened under the ESA. For example, increased road use may

7  lead to fragmentation of Canada Lynx habitat, or negatively impact the Lynx's food source

8  (showshoe hare). Id. at ¶ 12. Ascot's operation will be located within known Northern Spotted

9  Owl activity areas, and noise from the project's continuous operation, for days and weeks at a

10  time, may interfere with the Owl's ability to hear its prey and hunt. Id. at ¶ 13, 14. And surface

11  disturbance and subsequent invasion by weeds may also impact two threatened plant species,

12  water howellia and Nelson's checker-mallow. Id. at ¶ 5, 11.

13        Last, trees will be felled to make room for drill pads and to widen roads. See Buchele

14  Decl. Ex. 6 at 3-4. Regrowth of these trees at high elevation occurs slowly and so their

15  destruction constitutes environmental harm of long duration. Increased road use can lead to

16  erosion and sediment runoff. See Buchele Decl. Ex. 18 (Photos of 2010 Ascot Drilling

17  Operation). And the noise, traffic, and heavy machinery associated with the project will likely

18  interfere with GPTF members who recreate, hunt, and fish in the area, including members who

19  recreate on and near the Green River. Lynch Decl. at ¶ 6.

20        The District of Colorado recently issued a preliminary injunction on facts very similar to

21  those at issue here. See San Luis Valley Ecosystem Council, 657 F.Supp.2d at 1239–1242.

22  There, the court enjoined the drilling of two exploratory wells because the agency approving that

23  action did not prepare an adequate EA and the project would "result in soil disturbance and dust,

MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION 3:11-cv-05510

Page 21

which may affect creeks and other water sources and could harm species listed under the

Endangered Species Act." Id. at 1240. The project threatened to harm plaintiff's recreational and

aesthetic interests, which, even if temporary, was not compensable by money damages. Id. at

1241. And the project threatened plaintiff's "environmental and procedural interests." Id. at

1240; see also id. at 1242 ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to

be irreparably harmed if [the defendant is] permitted to go forward with the very actions that

threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."). Here,

unlike in San Luis Valley, the USFS has not performed any NEPA review despite its

unfamiliarity with mineral drilling. And preliminary relief is necessary to forestall both injury to

the environment and the uninformed decision-making that NEPA was designed to eliminate.

**C.      The Balance of Hardships Tips in Favor of Preliminary Relief.**

Where injury to the environment is at stake, "the balance of harms will usually favor the

issuance of an injunction to protect the environment." Amoco, 480 U.S. at 545. For that reason,

the Ninth Circuit has explained that issuing an injunction over defendant's pecuniary loss is a

"classic, and quite proper, examination of the relative hardships in an environmental case." Save

Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1125 (9th Cir. 2005); see also Oregon State Public

Interest Research Group v. Pacific Coast Seafoods Co., 374 F.Supp.2d 902, 908 (D.Or. 2005)

("[E]conomic injury to the defendant deserves less weight when balanced against environmental

harm.") (citing League of Wilderness Defenders v. Forsgren, 184 F.Supp.2d 1058, 1070-71

(D.Or. 2002). Last, the equities generally do not favor defendants who bring on their own harms.

See e.g. Conservation Congress v. U.S. Forest Serv., 2011 WL 1087463 *6 (E.D.Cal. March 4,

2011) (Slip Copy) ("[W]here the defendant-intervenor is on notice of a potential injunction, the

court should not balance the harms that would flow to that party as a result of the injunction.")

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 22

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1    (citing <u>Desert Citizens Against Pollution v. Bisson</u>, 231 F.3d 1172, 1187 (9th Cir. 2000)).

2         Here, the USFS's role in approving Ascot's drilling operation is simply to ensure that its

3    surface estate is not harmed. The requested relief will further that interest, not hinder it. This

4    Court should also consider that the USFS was on actual notice of its duties nearly three months

5    before it approved Ascot's application. <u>See</u> Buchele Decl. Ex. 8. It had nearly four months to

6    take even the most rudimentary steps under NEPA. And USFS staff were even on notice by the

7    Agency itself that NEPA and special use regulations apply. <u>See</u> Buchele Decl. Exs. 12 & 14.

8    **D.    A Preliminary Injunction is in the Public Interest.**

9         Preserving the "precious, unreplenishable resources" of our natural environment

10   promotes the public interest. <u>Kootenai Tribe of Idaho v. Veneman</u>, 313 F.3d 1094, 1125 (9th

11   Cir. 2002), <u>overruled on other grounds by</u> <u>Wilderness Soc'y v. U.S. Forest Serv.</u>, 630 F.3d 1173

12   (9th Cir. 2011). As such, the public is served by enjoining federal action undertaken without

13   "careful consideration" of environmental impacts. <u>Cottrell</u>, 632 F.3d at 1138; <u>see also</u> <u>Sierra</u>

14   <u>Club v. Bosworth</u>, 510 F.3d 1016, 1033 (9th Cir. 2007) ("the public interest favor[s] issuance of

15   an injunction because allowing a potentially environmentally damaging program to proceed

16   without an adequate record of decision runs contrary to the mandate of NEPA").

17        Here, protecting the Gifford Pinchot National Forest and Mt. St. Helens National

18   Volcanic Monument is particularly important. That area is unique and invaluable for studying

19   how ecosystems heal after a natural disaster (the Mt. Saint Helens eruption), and for conservation

20   of sensitive species, including those listed under the ESA. Moreover, the USFS has a legal

21   obligation to comply with NEPA and its own regulations by subjecting Ascot's drill operation to

22   public scrutiny and environmental review. An injunction would thus promote the public interest

23   in both protecting the environment and ensuring fidelity to the law.

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510

Page 23

Field Jerger LLP
621 SW Morrison, Ste. 1225
Portland, OR 97205
(503) 228-9115
(503) 225-0276(fax)

1   **E.      No Bond Should Be Required or The Bond Should Be Nominal.**

2         This Court should not require Plaintiff to post a bond before issuing a preliminary

3   injunction. The Ninth Circuit has ruled that such bonds have a chilling effect on public interest

4   litigants seeking to protect the environment, and should be nominal or waived entirely. People ex

5   rel. Van de Kamp v. Tahoe Regional Plan, 766 F.2d 1319 (9th Cir. 1985) (no bond). Other

6   federal courts have done the same. See Wilderness Soc'y v. Tyrrel, 701 F. Supp. 1473, 1491

7   (E.D. Cal. 1988) ($100 bond), rev'd on other grounds at 918 F.2d 813 (9th Cir. 1990); West

8   Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232, 236 (4th Cir. 1971)

9   ($100 bond); Sierra Club v. Block, 614 F. Supp. 488 (D.D.C. 1985) ($20 bond).

10                              **VI.  CONCLUSION**

11        For the reasons above, GPTF respectfully requests that this Court enter a temporary

12  restraining order and a preliminary injunction barring any occupancy or disturbance of the

13  National Forest pursuant to the USFS May 5th concurrence letter and pending a final ruling on

14  the merits of GPTF's claims.

15        DATED this 7th day of July, 2011.

16

17    _s/  Tom Buchele_____          _s/  R. Scott Jerger_____
        Tom Buchele                       R. Scott Jerger
18      OSBA No. 081560 (*pro hac vice*)  WSBA No. 42812
        Pacific Environmental Advocacy Center   Field Jerger LLP
19      10015 SW Terwilliger Blvd.        621 SW Morrison, Ste. 1225
        Portland, OR 97219                Portland, OR 97205
20      Telephone: (503) 768-6736         Telephone: (503) 228-9115
        Fax: (503) 768-6642               Fax: (503) 225-0276
21      E-mail: tbuchele@lclark.edu       E-mail: scott@fieldjerger.com

22

23

MEMORANDUM IN SUPPORT OF          Page 24                  Field Jerger LLP
MOTION FOR TEMPORARY                                 621 SW Morrison, Ste. 1225
RESTRAINING ORDER AND                                    Portland, OR 97205
PRELIMINARY INJUNCTION                                     (503) 228-9115
3:11-cv-05510                                           (503) 225-0276(fax)

CERTIFICATE OF SERVICE

I certify that on July 7, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Scott@fieldjerger.com

tbuchele@lclark.edu

and I sent the foregoing document out via e-mail to the following attorneys who have not yet entered an appearance in this case:

brian.kipnis@usdoj.gov

Dated July 7, 2011                    s/Tom Buchele

                                    OSB # 081560 (*Pro hac vice*)

                                    Counsel for Plaintiff

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
3:11-cv-05510                    Page 25                    Field Jerger LLP
                                                621 SW Morrison, Ste. 1225
                                                Portland, OR 97205
                                                (503) 228-9115
                                                (503) 225-0276(fax)